IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RENEE JOHNSON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | NO. 15-625 |
| PENNSYLVANIA ORGANIZATION | : | |
| FOR WOMEN IN EARLY RECOVERY | : | |

## MEMORANDUM

**KEARNEY, J.**                                                                                       **October 31, 2016**

Employers may not fire employees to retaliate for their complaining about race discrimination or hostile work environment based on race. But when the employer has already given the employee an ultimatum of either presenting an improvement plan or be terminated because legitimate discipline reasons described to the employee over several years, and the employee then only responds on her last day by adding language about race discrimination instead of offering an improvement plan, the employer's earlier-established legitimate disciplinary reasons for firing the employee cannot, absent specific evidence, be characterized as pretext. The employee's disciplinary history legitimately warranting termination is not expunged based solely on a last minute race discrimination claims absent evidence. When, as here, the former employee cannot show a preponderance of evidence demonstrating the employer's legitimate termination reasons are pretext for an invidious discriminatory intent after several earlier warnings and the employee's failure to present a remediation plan as required by her employer, we grant the employer's motion for summary judgment on the employee's retaliation claims.

# I. Undisputed facts.

Pennsylvania Organization for Women in Early Recovery ("POWER") is "committed to quality gender-responsive, trauma-informed care" in providing assistance to women suffering with drug and alcohol addiction.[1] POWER's Halfway House provides residential gender-responsive, trauma-informed care to women.[2]

In December 2010, POWER hired Renee Johnson as a Recovery Support Specialist ("RSS") in its Halfway House.[3] Ms. Johnson is an African American woman. Ms. Johnson worked the overnight shift responsible for "compiling Intake Packs, medication administration sheets, cleaning duties, participating in staff development and training as required, supporting the organization's mission along with sensitivity of cultural diversity and workplace harmony; and was required to be able to climb steps, lift light boxes, and work the hours necessary to complete the work."[4]

### A. POWER's repeated issues with Ms. Johnson's communications and performance.

Ms. Johnson's supervisors raised issues with her performance in Fall 2011, Spring 2012, and Summer 2013. Supervisors recorded the incidents and discussions in Ms. Johnson's personnel file. Dennene Kappel directly supervised Ms. Johnson's until POWER terminated Ms. Kappel's employment in September 2013.[5] Gretchen Luchs and Carol Haley-Smith also supervised Ms. Johnson.[6]

### *Fall 2011 issues*

Beginning in Fall 2011, POWER spoke to Ms. Johnson about her failure to properly complete paperwork on numerous occasions. Supervisor Luchs notified Ms. Johnson the Intake Packs were wrong on October 24, 2011 and instructed Ms. Johnson on proper procedure.[7] Supervisor Luchs separately showed Ms. Johnson an incorrect Intake Pack and Supervisor Luchs

2

explained how it should be compiled.[8] On November 7, 2011, Supervisor Kappel wrote a memorandum to Ms. Johnson detailing the Intake Pack discussions between Ms. Johnson and supervisors.[9] Ms. Johnson refused to sign the memorandum and instead wrote "refused to sign" on her signature line.[10] A few days later, POWER issued a memorandum to all RSS staff, including Ms. Johnson, regarding issues with Intake Packs and patient's medication documentation.[11] Ms. Johnson also refused to sign this memorandum.[12]

### *Spring 2012 issues*

In Spring 2012, POWER's clinical director raised issues and suggested moving towards termination in light of Ms. Johnson's Performance Review with some of Ms. Johnson's supervisors and Olivia Zitelli from Human Resources.[13] In her Performance Review, supervisors scored Ms. Johnson a two out of four in: (1) Interpersonal Skills & Approach; (2) Teamwork; (3) Quality of Work; (4) Productivity; (5) Communication; (6) Attendance & Punctuality; (7) Initiative, and; (8) Willingness to Change.[14] POWER's clinical director suggested Ms. Johnson's supervisors and Human Resources "move towards termination" in light of this Performance Review.[15]

POWER decided not to discharge Ms. Johnson based on her Spring 2012 Performance Review. Instead, it provided Ms. Johnson a written reminder detailing Ms. Johnson's "unacceptable behaviors" leading to the Performance Review.[16] These "unacceptable behaviors" included "ignoring communications from Ms. Kappel; failing to follow through on an assignment; talking negatively about staff, colleagues, and POWER; berating co-workers, raising her voice and making an inappropriate comment when speaking to Ms. Haley-Smith; belittling another staff person to a client[17], and refusing to sign a staff memo and suggesting the same to others; downloading computer games and programs with viruses; and acting disrespectfully

3

toward Ms. Diane Johnson."[18] Ms. Johnson's supervisors met with her regarding these "unacceptable behaviors" and Ms. Johnson stated she would respond to requests and directives promptly and only use the work computer for work-related duties.[19]

*Summer 2013 issues*

In Summer 2013, POWER gave Ms. Johnson a second written reminder of "unacceptable behaviors." POWER identified the "unacceptable behaviors" as "hanging up upon Ms. Kappel during a conversation about PTO, raising her voice and using a demanding tone with Ms. Johnson, again visiting non-work related sites on the work computer, and her blatant refusal to follow Ms. Diane Johnson's directive to rank her shift choices."[20] POWER told Ms. Johnson if her unacceptable behaviors did not stop and Ms. Johnson did not start "immediate and sustained improvement," POWER would take further action including possible termination.[21]

Ms. Johnson's October 2013 Performance Review did not show "immediate and sustained improvement" as evidenced by Ms. Johnson's supervisors rating her a score of one out of three in: (1) Customer Satisfaction & Value; (2) Trauma Understanding and Practice; (3) Interpersonal Skills & Approach; (4) Cooperation and Teamwork, and; (5) Managing Change/Innovation.[22]

**B. Incidents leading to termination.**

On January 2, 2014, POWER received a complaint Ms. Johnson used rude and intimidating language with a client on December 31, 2013.[23] On January 9, 2014, POWER received another complaint from a co-worker stating, on January 1, 2014, Ms. Johnson raised her voice and used vulgar language towards the co-worker, and the co-worker stated this incident occurred in front of a client.[24] These two complaints caused POWER to issue a "Final Written Reminder/Decision Making Day" to Ms. Johnson. On January 21, 2014, POWER told Ms.

4

Johnson there is a "resurgence of unprofessional behaviors previously addressed in the June 5, 2012 and July 22, 2013 written reminders, specifically her rude and intimidating language with clients and other staff on December 31, 2013 and January 1, 2014."[25]

POWER explained to Ms. Johnson under its "Final Written Reminder/Decision Making Day" procedure, Ms. Johnson is required to take January 22, 2014 as a paid day off.[26] On January 22, 2014, POWER required Ms. Johnson evaluate her behavior and "in order to return to work, [she] will write a letter to POWER explaining [her] commitment and the consequences of failing to meet this commitment."[27] POWER explained if, after her January 22, 2014 Decision Making Day, Ms. Johnson did not present a satisfactory plan, POWER would terminate her employment.[28]

### C. Ms. Johnson's protected activity.

On her January 22, 2014 Decision Making Day, Ms. Johnson wrote to POWER stating she is unaware of the alleged incidents on December 31, 2013 and January 1, 2014 but "am willing to work and put together a plan for any change in my performance as required."[29] Ms. Johnson stated she always acted in a professional manner and her performance improved following her two written reminders.[30] With regard to previous incidents, Ms. Johnson stated she is never "allowed to address the incidents with [her] side of the story."[31]

In closing her letter, Ms. Johnson stated "during my employment at Power my position has been threatened on several occasions and I feel that I have been discriminated against, retaliated against, and subjected to a hostile work environment because of my race."[32] Ms. Johnson offered no details or allegations of discriminatory interactions.[33]

5

### D. Absent the required improvement plan, POWER terminates Ms. Johnson's employment.

Ms. Johnson gave her January 22, 2014 letter to POWER's Clinical Director, Ms. Diane Johnson. Director Johnson found the letter insufficient because it did not include the required improvement plan.[34] On January 23, 2014, POWER scheduled a final meeting with Ms. Johnson. Director Johnson, Ms. Zitelli from Human Resources, and Rosa Davis attended for POWER.

Ms. Johnson arrived twenty minutes late for the meeting.[35] POWER discussed the December 31, 2013 and January 1, 2014 incidents. POWER asked Ms. Johnson for her perspective on those incidents. Ms. Zitelli stated Ms. Johnson's "recount was that she did not raise her voice at anyone, her description of the engagements…were not intended to be rude."[36]

POWER then turned to Ms. Johnson's insufficient improvement plan from her Decision Making Day. POWER asked Ms. Johnson to provide details on how she planned to develop and execute an improvement plan.[37] Ms. Johnson stated her improvement plan would be to "just keep [her] mouth shut."[38]

POWER terminated Ms. Johnson's employment as "Not a Good Fit."[39] Ms. Zitelli felt Ms. Johnson's "communication style was not likely to be intentional misconduct, but rather an inability to have insight as to how she projected to others, and [Ms. Johnson] was not willing to try options where she could learn this."[40] Ms. Zitelli informed Ms. Johnson she could terminate her for violating POWER's policies but preferred "not a good fit" to allow Ms. Johnson to be eligible for unemployment benefits.[41] Ms. Johnson sued POWER.

## II. Analysis

POWER moves for summary judgment on Ms. Johnson's remaining claim for retaliatory discharge under Title VII and under the PHRA.[42] Ms. Johnson alleges POWER terminated her employment on January 23, 2014 in retaliation for her January 22, 2014 letter complaining about

race discrimination under Title VII.[43]

Under the *McDonnell Douglas* frame work, to prove retaliatory firing, Ms. Johnson must first establish a prima facie case of retaliation; the burden then shifts to POWER to "articulate a legitimate nondiscriminatory reason for the adverse employment action."[44] If POWER articulates such a reason, Ms. Johnson must prove "by a preponderance of the evidence that the employer's explanation is pretextual."[45]

The first two steps of Ms. Johnson's retaliation claim are not genuinely disputed. Ms. Johnson established a prima facie case of retaliation because January 22, 2014 letter alleging racial discrimination is sent to POWER the day before POWER terminated Ms. Johnson's employment. POWER argues it terminated Ms. Johnson's employment because of three incidents on December 31, 2013-January 1, 2014 which, combined with Ms. Johnson's previous disciplinary issues and her unwillingness to take corrective action, made Ms. Johnson "not a good fit" with POWER.

**A. Ms. Johnson establishes a prima facie case of retaliation.**

Taking all inferences in favor of Ms. Johnson, she establishes a prima facie case of retaliatory termination because her protected activity and her discharge occurred within a day of each other and this closeness in time is suggestive of causation.

Ms. Johnson's January 22, 2014 letter stated because of her race she felt discriminated against, retaliated against, and subject to a hostile work environment at POWER. Ms. Johnson did not elaborate on specific instances or underlying reasons. The next day, POWER terminated Ms. Johnson's employment after a meeting.

"Where the temporal proximity between the protected activity and the adverse action is 'unusually suggestive', it is sufficient standing alone to create an inference of causality and

7

defeat summary judgment."[46] In *Jalil*, the employer discharged an employee two days after filing an EEOC complaint.[47] Our Court of Appeals found this temporal proximity supported the employee's causation prong for his retaliatory firing claim.[48] Ms. Johnson alleges a prima facie case of retaliation because POWER fired her one day after her January 22, 2014 letter.

### B. POWER demonstrated legitimate, nondiscriminatory reasons for terminating Ms. Johnson's employment.

Because Ms. Johnson established a prima facie retaliation, POWER must "answer its relatively light burden by articulating a legitimate reason for the unfavorable employment decision."[49]

POWER argues it decided to terminate Ms. Johnson's employment after incidents on December 31, 2013 and January 1, 2014. On January 21, 2014, POWER decided, in light of Ms. Johnson's earlier disciplinary issues, to give her a one day opportunity to prepare a plan for corrective action or Ms. Johnson would be terminated. On January 23, 2014, POWER terminated Ms. Johnson's employment because Ms. Johnson failed to prepare a plan for corrective action and her communication style did not constitute a good fit for POWER. Ms. Johnson concedes POWER has three legitimate nondiscriminatory reasons for terminating her employment: "(1) that Johnson was terminated due to her disciplinary history; (2) that Johnson was terminated due to increasing complaints from clients and staff; and (3) that Johnson refused to create an adequate improvement plan, insisting she would keep her mouth shut."[50]

POWER adduced evidence Ms. Johnson remained unwilling to improve her communication style. POWER issued two written reminders to Ms. Johnson about raising her voice, berating co-workers, making inappropriate comments, and being disrespectful to co-workers and clients, POWER described these actions as "unacceptable behaviors." After each written reminder, POWER explained to Ms. Johnson if she did not improve these behaviors,

8

POWER would terminate her employment. Ms. Johnson then engaged in "unacceptable behaviors" on December 31, 2013 and January 1, 2014. POWER told Ms. Johnson she would be terminated unless she developed an improvement plan. POWER found Ms. Johnson's letter an insufficient improvement plan and gave her one more in-person opportunity to develop a plan. Ms. Johnson stated her plan would be to "keep [her] mouth shut." POWER satisfied its burden it terminated Ms. Johnson's employment for a legitimate, nondiscriminatory reason because Ms. Johnson remained unwilling to improve her communication style.

### C. POWER's reasons for terminating Ms. Johnson's employment are not pretext.

Because POWER stated legitimate, nondiscriminatory reasons for terminating Ms. Johnson, Ms. Johnson now must prove "by a preponderance of the evidence that the employer's explanation is pretextual."[51] The Supreme Court requires "Title VII retaliation claims must be proved according to the traditional principles of but-for causation."[52] Ms. Johnson must prove pretext either by points to "evidence that would allow a factfinder to disbelieve the employer's reason for the adverse employment action" or "point to evidence that would allow a factfinder to believe that an invidious discriminatory reason was 'more likely than not a motivating or determinative case' of employer's action."[53] Ms. Johnson does prove pretext by either method.

POWER started terminating Ms. Johnson's employment on January 21, 2014. POWER decided, in light of the incidents on December 31, 2013 and January 1, 2014 which stemmed from the same issues in the two earlier written reminders Ms. Johnson failed to improve on, it would issue Ms. Johnson an ultimatum. If Ms. Johnson did not develop a satisfactory improvement plan to correct her behavior, POWER would terminate her employment. Ms. Johnson's improvement plan amounted to a denial, an offer to put together a plan in the future, and the charge of retaliatory action based her race. Ms. Johnson modified her improvement plan

9

during her meeting with POWER to "just keep [her] mouth shut." POWER found Ms. Johnson's improvement plan insufficient and terminated her employment.

Ms. Johnson argues POWER's reasons are pretext for two reasons. First, Ms. Johnson argues POWER's stated reason is pretext because POWER refused to "inform Johnson of any alleged specifics about her alleged misconduct, beyond that it was "rude and intimidating" which is an "implausible and incoherent contradiction" of POWER's legitimate nondiscriminatory reason. Second, Ms. Johnson argues her January 22, 2014 letter negated all prior legitimate, nondiscriminatory reasons for terminating Ms. Johnson's employment so any firing without investigating the Title VII claims is pretext. Ms. Johnson does not prove "but for" her protected action she would still be employed by POWER.

**1. POWER's reasons for termination are not implausible or incoherent.**

Ms. Johnson's first argument fails because POWER's choice to terminate Ms. Johnson's employment as "not a good fit" is not an "implausible and incoherent contradiction" evidencing pretext. POWER terminated Ms. Johnson's employment because Ms. Johnson's "communication style was not likely to be intentional misconduct, but rather an inability to have insight as to how she projected to other, and that Renee was not willing to try options where she could learn this."[54] Ms. Zitelli informed Ms. Johnson she could terminate her for violations of POWER's policies but preferred "not a good fit" to allow Ms. Johnson to be eligible for unemployment benefits.[55]

There is nothing implausible or incoherent about POWER's reasons for terminating Ms. Johnson's employment. Ms. Johnson concedes POWER had two legitimate nondiscriminatory reasons to fire Ms. Johnson which would not be pretext.[56] POWER gave Ms. Johnson to opportunity to submit an improvement plan regarding incidents on December 31, 2013 and

10

January 1, 2014. Even if Ms. Johnson remained unaware of the specifics of the incidents when she wrote her January 22, 2014 letter, POWER made her aware of the allegations during her January 23, 2014 meeting because her "recount was that she did not raise her voice at anyone, her description of the engagements...were not intended to be rude."[57] We do not find "but for" Ms. Johnson's January 22, 2014 letter alleging racial discrimination, POWER would not have terminated Ms. Johnson employment as "not a good fit." POWER's reasons are direct and not contradictory. Ms. Johnson failed to present a plan to cure a longstanding concern.

### 2. There is no evidence POWER is motivated by invidious discriminatory reasons.

Ms. Johnson's second argument fails because we do not find Ms. Johnson's January 22, 2014 letter negated all of POWER's earlier legitimate, nondiscriminatory reasons for terminating Ms. Johnson's employment.

"An employee may not insulate herself from termination by covering herself with the cloak of Title VII's opposition protections *after* committing non-protected conduct that was the basis for the decision to terminate. If subsequent conduct could prevent an employer from following up on an earlier decision to terminate, employers would be placed in a judicial straight-jacket not contemplated by Congress."[58]

In *Proudfoot v. Arnold Logistics, LLC*, an employee with a disability is insulted and called names because of his disability.[59] The disabled employee then threatens to injure the co-worker who made fun of him while speaking with another co-worker.[60] The disabled employee's supervisors investigated the threats and decided to terminate the disabled employee's position.[61] After the disabled employee is informed his supervisors investigated the threats but before they decided to terminate, the disabled employee complained of harassment under the Americans with Disabilities Act.[62] The court found the disabled employee failed to show the employer's reason

11

is pretext because, "[t]he one-day lapse between [disabled employee's] complaint and termination here does not discredit [employer's] proffered justification for terminating him....only after [employer] informed [the disabled employee] that is was investigating the threats did [disabled employee] complain of harassment."[63]

Nearly the exact same facts are present here. POWER issued Ms. Johnson an ultimatum on January 21, 2014 stating Ms. Johnson will be fired if she does not develop an acceptable improvement plan. On January 22, 2014, Ms. Johnson sent POWER a letter stating she felt discriminated against, retaliated against, and subjected to a hostile work environment because of her race. On January 23, 2014, POWER terminated her employment "as not a good fit" because her "communication style was not likely to be intentional misconduct, but rather an inability to have insight as to how she projected to others, and that Renee was not willing to try options where she could learn this."[64] We find Ms. Johnson's protected action occurred after the incidents which caused POWER to terminate her employment and Ms. Johnson's January 22, 2014 letter attempts to "cover herself with the cloak of Title VII's opposition protections *after* committing non-protected conduct that was the basis for the decision to terminate."[65]

We do not find "but for" Ms. Johnson's January 22, 2014 letter asserting she is retaliated against based on race, she would still be employed at POWER. Ms. Johnson has not adduced evidence proving POWER's legitimate nondiscriminatory reasons are pretext.[66]

### III. Conclusion

In the accompanying Order, we grant POWER's motion for summary judgment because, viewing all facts in a light most favorable to Ms. Johnson, she is unable to prove POWER's legitimate nondiscriminatory reasons for terminating her employment were pretext. Ms. Johnson did not adduce evidence showing us "but-for" her January 22, 2014 letter she would not have

12

been fired by POWER. The undisputed record evidences POWER terminated Ms. Johnson after several warnings on the same communication concerns and Ms. Johnson's inability to present a plan to remedy the concerns after learning POWER would terminate her for lack of a plan.

---

[1] ECF Doc. 49 ¶ 1.

[2] *Id.* ¶¶ 1-2.

[3] *Id.* ¶ 4. Ms. Johnson's first title is Counselor Aide. POWER changed her title to Recovery Support Special in June 2012 and it is the title she held when POWER terminated her employment.

[4] *Id.* ¶ 5.

[5] ECF Doc. No. 40 at 17.

[6] ECF Doc. 49 ¶ 18-20.

[7] *Id.* ¶ 32.

[8] *Id.* ¶ 33.

[9] *Id.* ¶ 34.

[10] *Id.* ¶ 35.

[11] *Id.* ¶ 39.

[12] *Id.* ¶ 40.

[13] *Id.* ¶ 52.

[14] *Id.* ¶ 53.

[15] *Id.* ¶ 52.

[16] *Id.* ¶ 55.

[17] A client is a resident of the Halfway House.

[18] *Id.* ¶ 55.

[19] *Id.* ¶ 57.

[20] *Id.* ¶ 72.

[21] *Id.* ¶ 73.

[22] *Id.* ¶ 76.

[23] ECF Doc. No. 35-1 at 30.

[24] ECF Doc. 49 ¶¶ 77-78; ECF Doc. No. 35-1 at 23.

[25] ECF Doc. 49 ¶ 79.

[26] *Id.* ¶¶ 79-88.

[27] *Id.* ¶ 80.

[28] *Id.* ¶¶ 80-81.

[29] ECF Doc. No 35-1 at 9.

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] Ms. Johnson does not allege specific factual instances of racial discrimination in her EEOC complaint or her complaint here. When asked why she felt discrimination and retaliation, Ms. Johnson testified because "all three of my culprits were white females, you know what I mean? This is within the Halfway House." ECF Doc. No. 35-4 at 66. She later testified another terminated employee could testify to Carol's prejudice, "not as in black and white. If she didn't like you, you were just targeted, pretty much, and then the follow up was Dennene." ECF Doc. No. 35-4 at 70. "Q: What do you mean by retaliated because of the race? A: Oh, like I said before, if I did something wrong, it was a double whammy. So if I was written up once for putting my cup too close, I was written up over and over and over again for the same thing." ECF Doc. No. 35-4 at 81.

[34] ECF Doc. No. 49 ¶ 84.

[35] *Id.* ¶ 86.

[36] ECF Doc. No. 35-1 at 10.

[37] ECF Doc. No. 49 ¶ 89.

[38] *Id.* ¶ 90.

[39] ECF Doc. No. 35-1 at 74.

[40] *Id.* at 10.

[41] *Id.*

[42] When reviewing a motion for summary judgment under Fed. R. Civ. P. 56(a), we "construe all facts and inferences in favor of the nonmoving party. Summary judgment is appropriate when 'the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' *Willis v. UPMC Children's Hosp, of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)(*internal citations omitted*).

[43] ECF Doc. No. 39. Because Title VII and PHRA require the same analysis, we address her claims. *See Goosby v. Johnson & Johnson Medical, Inc.*, 228 F.3d 313 fn. 3 (3d Cir. 2000).

[44] *Willis*, 808 F.3d 638, 644-645 (*citing Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

[45] *Fuentes*, 32 F.3d at 763.

[46] *LeBon v. Lancaster Jewish Community Center Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)(citing *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989)).

[47] *Jalil*, 873 F.2d at 708.

[48] *Id.*

[49] *Fuentes*, 32 F.3d at 763.

[50] *Id.*

[51] *Id.*

[52] *University of Texas Southwestern Medical Center v. Nassar*, __U.S.__, 133 S.Ct. 2517, 2533 (2013).

[53] *Willis*, 808 F.3d at 644-645 (*citing Fuentes*, 32 F.3d at 764).

[54] ECF Doc. No. 35-1 at 10.

[55] ECF Doc. No. 35-1 at 10.

[56] ECF Doc. No. 37 at 11.

[57] ECF Doc. No. 35-1 at 10.

[58] *Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc.*, 450 F.3d 130, 137 (3d Cir. 2006)(internal citation omitted).

[59] *Proudfoot v. Arnold Logistics, LLC*, 629 Fed.Appx. 303, 304-305 (3d. Cir. 2015).

[60] *Id.*

[61] *Id.*

[62] *Id.* at 309.

[63] *Id.*

[64] ECF Doc. No. 35-1 at 10.

[65] *Curay-Cramer*, 450 F.3d at 137.

[66] *Nassar*, 133 S.Ct. at 2533.